# AFFIDAVIT FOR SEARCH WARRANT

Affiant, Rodd Watters, having been first duly sworn, deposes and states as follows:

1. This affidavit is submitted in support of a search warrant for the premises, residences, outbuildings and vehicles in custody and/or control of by Dennis MOORE aka "DA" which are located at 4030 Lynncrest Drive N.E. in Cleveland, Tennessee. I am a Special Agent with the Tennessee Bureau of Investigation ("TBI") as well as a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), United States Department of Justice. As such, I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) and empowered by law to conduct investigations of, among other things, offenses enumerated in Title 21, United States Code, Section 846. I have been employed as a TFO with DEA for the past year and a half. I have been employed as a narcotics investigator for TBI for the past 20 years. In connection with my official TBI/DEA duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848. I have also been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking, and of the laundering and concealing of proceeds of drug trafficking for the past 20 years. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers, including numerous specialized narcotics investigation schools. I am currently assigned to the Chattanooga Resident Office. This search warrant affidavit is in support of a search warrant for the residence of Dennis MOORE, which is located at **4030 Lynncrest Drive N.E., Cleveland, Tennessee.**

2. I have received specialized training in the investigation of criminal activity from the TBI, as well as various other state law enforcement agencies, and have kept abreast of criminal activities, case developments, procedures, investigative techniques, and other standardized methods of investigation

involving property crimes during this time period. I have worked with federal, state, and local agencies in investigations in which stolen properties were recovered and have participated in numerous searches of persons and places for the purpose of recovering stolen goods. I have participated in Organized Crime Drug Enforcement Tasks Forces ("OCDETF") in which narcotics were possessed, bought, sold, and traded and have assisted in the application and service of search warrants and arrest warrants in these cases.

Based upon Affiant's training, experience, and participation in investigations involving the distribution of narcotics, Affiant knows:

(a) That drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies;

(b) That drug traffickers very often place assets in corporate entities in order to avoid detection of these assets by government agencies;

(c) That even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

(d) That large-scale narcotics traffickers must maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

(e) That narcotics traffickers frequently maintain books, records, receipts, notes ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances and chemicals. That narcotics traffickers commonly "front" (provide narcotics on consignment) controlled substances to their clients; that the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

(f) That it is common for large-scale drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences and/or their businesses for their ready access and to conceal from law enforcement authorities;

(g) That it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

(h) That it is common for large-scale drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence, their businesses and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

(i) That, in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or businesses. That there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences of narcotics traffickers;

(j) That it is common for persons involved in large-scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses or other locations which they maintain dominion and control over.

(k) That large-scale traffickers often utilize electronic equipment such as computers,

telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, records and/or store the information described in items a, c, d, e and g above.

(l) That when drug traffickers amass large proceeds from the sale of drugs and/or chemicals that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys, and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency.

(m) That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

(n) That it is common for drug dealers to physically handle and count the "street money" after receiving it in exchange for the controlled substances, thereby leaving residue traces of controlled substances on the "street money." That law enforcement agencies own dogs which are trained to react to the scent of controlled substances and residue traces of controlled substances; and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers.

(o) That it is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1000.00 increments to facilitate quick counting;

(p) That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions;

(q) That the Currency Transaction Report (CTR) (IRS form 4789), which is required

to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000 causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

(r) That, in order to evade the filing of a CTR, narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

(s) That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

(t) That controlled substances traffickers commonly maintain addresses of telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

(u) That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product. That these traffickers usually maintain these photographs in their possession.

(v) That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

(w) That drug traffickers commonly have in their possession, that is, on their person, at their residences and/or their businesses, firearms, including but not limited to: handguns, pistols,

revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records and U.S. currency.

### Probable Cause

1. On September 19, 2017, as well as several times after that date, Affiant and DEA TFO Mark Delaney interviewed a TBI Confidential Source ("CS-2") to obtain intelligence on individuals distributing illegal narcotics in Cleveland, Tennessee, and surrounding areas, as well as illegal activity being conducted by individuals of the Gangster Disciple's street gang. For several months, CS-2 had been hanging around Dennis MOORE, aka "DA," a validated member of the Gangster Disciples. MOORE had been introducing CS-2 to numerous other members of the gang. CS-2 said around February of 2017, MOORE spoke to the members of the Gangster Disciples and CS-2 was then made a member of the Gangster Disciples street gang.

2. Affiant is aware that CS-2 has proven reliable. For example, CS-2 has provided information in another case, which law enforcement corroborated, that led to the arrest and federal indictment of two individuals on narcotics charges.

3. CS-2 provided the following information pertaining to some of the members of the Gangster Disciples. CS-2 identified Monte Brewer, aka "Hutch," as the muscle and a "shooter" for the Gangster Disciples. CS-2 also stated Brewer is a member of a group of Gangster Disciples known as the "Black Out Squad." CS-2 said the "Black Out Squad" is a group responsible for killing or beating people deemed to be a threat to the Gangster Disciples. CS-2 provided the name of Kentrell Martin, aka "Trell," as a high-ranking member of the Gangster Disciples and source of supply for illegal narcotics for the group. CS-2 said "Blue Sosa" (identity unknown) is the literature coordinator for their group. Chase

Page **6 of 16**

Case 1:18-mj-00052-TRM   Document 2   Filed 05/18/18   Page 6 of 19   PageID #: 7

Christian, aka "Bos White," Devante Welch, aka "G-Code," Talaferro HUDGINS, aka "Duck," Dennis Moore, aka "DA," Reginald Williams, aka "Nu-Nu" and "Nino," Chizarae Dunigan, aka "Loyalty," Dakota Reed, aka "G-Strive, Demetrius James, aka "Black Meechie," Austin La "Tra" Dodd, and Corey Dodd, aka "K-Gramz,"are known members of the Gangster Disciples. CS-2 also provided the name of William Phillips, aka "Chizzle," another high-ranking Gangster Disciple from Nashville, Tennessee, who is also a source of supply for illegal narcotics to the group. CS-2 also provided the names of "Blue," and "Squeeze," later determined to be Shawn Theus, a Gangster Disciple from Memphis, Tennessee, that is staying in Chattanooga and Cleveland, Tennessee. CS-2 provided information to Affiant that the above subjects were involved in the distribution of illegal narcotics, to include heroin, a Schedule I controlled substance, as well as criminal gang activity in the Cleveland and Chattanooga, Tennessee, area. CS-2 also provided a telephone number utilized by MOORE.

4. CS-2 stated that MOORE resided at a residence on Lynncrest Drive in Cleveland with his girlfriend, and that CS-2 has been to that address on numerous occasions. CS-2 directed Affiant to a residence located at **4030 Lynncrest Drive,** identifying it as MOORE'S residence. Upon checking utility records for **4030 Lynncrest Drive,** Affiant learned that the subscriber for power at this residence is Kimetia Ball. Based on this investigation Affiant is aware that Ball is the wife/girlfriend of MOORE.

5. Affiant subpoenaed subscriber and toll records for the phone number identified by CS-2 as being utilized by MOORE. Upon receiving the subpoenaed information, Affiant discovered the listed subscriber for this telephone was Summer Tilley. Based on the investigation, Affiant learned that Tilley was the wife/girlfriend of Talaffero Hudgins, aka "Duck," whom CS-2 stated was an associate of MOORE (as well as a fellow member of the Gangster Disciples), and from whom CS-2 had been purchasing heroin.

6. From September 21, 2017, to the present, Affiant, along with other law enforcement, began

making and/or attempted to make controlled purchases of heroin from several members of this organization. Affiant and other law enforcement successfully made controlled purchases of heroin and/or illegal narcotics from MOORE, Hudgins, "Hutch," Williams, Dunigan, and Martin. Affiant and other law enforcement attempted to make controlled purchases of illegal narcotics from Theus and Phillips, but were unsuccessful. Investigators did, however, did obtain substantial recorded conversations regarding the distribution of illegal narcotics, including heroin. During each controlled purchase and attempted controlled purchase, Affiant, as well as other law enforcement, conducted the following procedures. The Confidential Source ("CS"), and his/her vehicle, was searched, the CS was fitted with a monitoring/recording device, and the CS was provided marked confidential funds to use during the purchase. The CS was followed directly to the meet location as well as away from the meet location, and was searched upon completion of the controlled purchase. During these controlled purchases or attempted controlled purchases, it is very apparent to Affiant and law enforcement that all the above subjects were associated with each other and assisting each other in the distribution of heroin and other illegal narcotics. This was evidenced by the discussions these subjects had about each other, how they showed up during drug purchases with each other, and how they obtained illegal narcotics from one another to finalize transactions.

7. On January 10, 2018, it was determined that the CS-2 could purchase re-sale quantities of heroin from MOORE, aka "DA." Affiant directed CS-2 to place a recorded telephone call to MOORE to discuss the purchase and price of heroin. Upon CS-2 making contact with MOORE, Affiant could overhear both sides of the conversation. During the conversation, Affiant overheard MOORE telling CS-2 about quantities and prices (depending on quantity) of heroin in his (MOORE'S) possession.

8. Affiant utilized CS-2 to conduct a controlled purchase of heroin from MOORE, using the

Page **8** of **16**

same procedures outlined above. After CS-2 and his/her vehicle was searched, CS-2 was provided $300 in marked TBI confidential funds to use in the purchase of heroin from MOORE. CS-2 was fitted with a recording device capable of recording the conversation between CS-2 and MOORE during the controlled purchase.

9. CS-2 was then followed from the undisclosed meet location directly to the residence of MOORE, located at **4030 Lynncrest Drive N.E. in Cleveland, Tennessee**. At approximately 2:40 pm, Affiant observed CS-2 pull into the driveway of the residence and walk to the front door. Affiant passed the residence and in the rearview mirror observed CS-2 knocking on the front door.

10. After a short time, Affiant, along with Bradley County Sheriff's Office Detective Marlow, followed CS-2 away from **4030 Lynncrest Drive N.E.** directly to an undisclosed location within Bradley County. Upon arrival at this location, CS-2 immediately turned over two small bags containing suspected heroin. CS-2 placed these items directly into a TBI self-sealing evidence bag, and the bag was sealed. CS-2 also turned over the recording device containing the recorded conversation of the purchase of the heroin from MOORE.

11. CS-2 and CS-2's vehicle were searched for any other contraband and/or money and none was located. CS-2 was debriefed by Affiant regarding the controlled purchase, and CS-2 stated that upon arriving at the residence, CS-2 approached the front door and knocked. CS-2 was let into the residence and immediately came into contact with MOORE and his girlfriend, known by CS-2 as "Kimmi." CS-2 advised that MOORE directed CS-2 into the kitchen area where the two small bundles of suspected heroin were lying on the counter. CS-2 stated that the confidential funds were given directly to MOORE for payment of the two bundles. CS-2 stated that MOORE remarked that he only had two more bundles left but someone was coming to get those and then it would be a few days before he obtained more from his

source. CS-2 stated that they engaged in some general conversation regarding Gangster Disciple members "Hutch" (Monte Brewer) and "Chizzle" (William Phillips) before CS-2 left the residence.

12. During the time of the above investigation by Affiant, DEA TFO Jamie Hixson began a concurrent investigation into heroin distribution in Chattanooga, Tennessee, by Gangster Disciples, specifically targeting Kentrell Martin, aka "Trell." The investigation into Martin lead TFO Hixson to apply for and obtain a court-authorized intercept of Martin's telephone. During this court-authorized intercept, numerous conversations were intercepted between Martin and other members of the Gangster Disciples, including Monte Brewer, aka "Hutch." These conversations were determined to be related to illegal narcotics distribution or gang violence. Based on these intercepts, TFO Hixson was able to obtain a court-authorized intercept of Monte Brewer's telephone on February 2, 2018.

13. During the interception of Brewer's telephone, agents intercepted MOORE, Hudgins, Phillips, and numerous other members of the Gangster Disciples street gang and associates of this organization. Most of the intercepted conversations between these subjects and other fellow Gangster Disciples street gang associates were determined to be related to narcotics distribution and/or gang violence.

14. On February 5, 2018, at 6:42 PM, monitors intercepted a conversation between Brewer and MOORE discussing how much heroin MOORE had left and also if he (MOORE) had any bullets that Brewer could get. MOORE told Brewer that he had about 12 grams, and Brewer told him to go ahead and get 2 grams for himself. The investigation revealed that Brewer was asking about the bullets due to a drive-by shooting that he (Brewer) was involved in a few days earlier in Chattanooga. MOORE was trying to get someone to go buy bullets for them. Later the same day, monitors intercepted another conversation between these two subjects and MOORE told Brewer that he (MOORE) obtained the requested 9mm and

.223 ammunition. Affiant contacted Tennessee State Probation regarding MOORE'S criminal history and determined that MOORE is a convicted felon, thus prohibited from possessing firearms or ammunition. Brewer is also a convicted felon and shares this disability.

15. On February 06, 2018, at approximately 8:36 pm, monitors intercepted another conversation between Brewer and MOORE. Based on affiant's training, experience, and knowledge of the case, MOORE was at "Squeeze's" (CaSedric Theus) house when Brewer called. MOORE and Theus told Brewer that they can't get any drugs in Chattanooga because of all the "heat" that Brewer and his group were causing there with all the shootings. Brewer stated that they haven't even used the "sticks," and they may need to put them in storage. Affiant is aware that "sticks" are a common street name for rifles. Brewer and MOORE also discussed how much heroin was left.

16. On February 7, 2018, at 6:18 pm, monitors intercepted another conversation between Brewer and MOORE. Based on Affiant's training, experience, and knowledge of this case, Affiant believes that MOORE is a co-conspirator of Brewer and Cameron Hunter-Loftin, and that Brewer was discussing collecting $3,100 from MOORE. Affiant knows from previously-intercepted calls that Brewer was collecting the $3,100 from MOORE at the direction of Hunter-Loftin, who has been identified as the heroin source of supply for MOORE and Brewer. In this call, MOORE explained to Brewer that he usually gave Hunter-Loftin $1,550 per ounce of heroin and that Hunter-Loftin fronted MOORE an additional ounce of heroin. Subsequent intercepts confirmed that Brewer did in fact collect the $3,100 from MOORE and that Hunter-Loftin did supply MOORE with heroin the following day.

17. On February 12, 2018, at 1:12 PM, monitors intercepted another conversation between Brewer and MOORE. Based on affiant's training, experience, and knowledge of the case, Brewer appeared to be on his way to Cleveland to bring Theus, aka "Squeeze," an ounce of heroin, but Theus was

at the doctor. Brewer told MOORE that he would bring it to him (MOORE) and get the money from Theus later. MOORE agreed, indicating that Brewer, MOORE, and Theus are associates of each other and are working together to further their illegal narcotics business as stated earlier in this affidavit regarding the associates of this gang.

18. Interception of Brewer continued until March 2, 2018. During the authorized interception of Brewer, monitors continued to intercept numerous conversations between Brewer and MOORE similar to those described above. It is apparent to law enforcement and Affiant, based on these interceptions, that Brewer was continuing to bring MOORE multiple ounce quantities of heroin as well as firearms and ammunition to MOORE'S residence.

19. On April 11, 2018, Affiant subpoenaed telephone toll information for telephone numbers associated with Brewer and MOORE. Upon examining the phone toll history for the requested telephones, Affiant found that Brewer was in contact with MOORE approximately 694 times from February 7, 2018, to April 7, 2018, with the last listed contact being April 10, 2018.

20. Upon examining the phone toll history for MOORE's telephone, Affiant found that MOORE was in contact with Hudgins approximately 263 times from February 7, 2018, to April 7, 2018, with the last contact between the two being on April 5, 2018. It was also noted by Affiant that MOORE was in contact with Hunter-Loftin during this same time-period approximately 83 times, with the last contact being April 1, 2018. Toll history also showed that MOORE remained in contact with Theus, Williams, and Phillips on a regular basis. Affiant believes that the phone tolls continue to show contact between the co-conspirators/associates of this criminal organization who have continued to distribute illegal narcotics, to include heroin, as well as involve themselves in violent gang activity.

21. On April 12, 2018, law enforcement contacted the Cleveland Utilities company and

Page **12 of 16**

Case 1:18-mj-00052-TRM    Document 2    Filed 05/18/18    Page 12 of 19    PageID #: 13

confirmed that the power at **4030 Lynncrest Drive N.E. in Cleveland, Tennessee**, was still in the name of Kimetia Ball, consistent with the subscription records obtained at the time of the January 10, 2018 controlled purchase from MOORE.

22. On Thursday May 17, 2018, at approximately 5:35 pm, Affiant conducted a drive-by surveillance of the residence of Dennis MOORE, located at **4030 Lynncrest Drive N.E. in Cleveland, Tennessee**. Upon approaching the residence, Affiant observed a gold Buick vehicle leaving the residence. This vehicle was backed into the driveway of **4030 Lynncrest Drive N.E.** on several surveillances and Affiant has been unable to obtain the vehicle registration. As Affiant passed the approaching Buick, affiant did observe MOORE as the driver of this vehicle.

23. Affiant circled the block and was able to catch up to the vehicle as it traveled on Rollingbrook Drive N.E. toward Michigan Avenue. Affiant followed this vehicle and MOORE directly to the CVS pharmacy located at 200 Stuart Road in Cleveland. As MOORE turned into the CVS pharmacy, Affiant set up surveillance in an adjacent parking lot and observed a white female approach the driver's side of the gold Buick and get into the vehicle. This female remained in the vehicle for a very short time, less than a minute or two, before exiting the Buick and walking back to a small blue pick-up truck. Both vehicles were observed exiting the parking lot of the CVS in different directions. Based on Affiant's training and experience, Affiant believes that due to the quick nature of the meeting, conducted in the front passenger compartment of the vehicle, that this was an illegal narcotics transaction.

24. Affiant attempted to maintain surveillance of the gold Buick in an attempt to obtain the vehicle registration. Affiant did finally observe the license plate, ran it through NCIC, which revealed it to be a 2014 Buick LAX registered to Dennis MOORE of **4030 Lynncrest Drive N.E. in Cleveland, Tennessee**. NCIC also provided an alert that MOORE is violent offender and serious threat to law

enforcement and to use extreme caution in dealing with this subject.

25. Based upon my training, experience, and knowledge, Affiant is aware of the fact that drug traffickers often keep evidence, fruits of the crime, and instrumentalities at their residence and in their vehicles. Similarly, individuals involved in drug trafficking often keep books, records, and other documents which relate to their illicit activities at their residence and in their vehicles. Furthermore, based on the investigation, specifically T-3 authorized telephone interceptions, Affiant is aware that MOORE has claimed to be in possession of ammunition, which, as a convicted felon, is a violation of Title 18, United States Code, Section 922(g)(1).

26. Affiant submits that probable cause exists to believe that Dennis MOORE, aka "DA," has been involved in heroin violations for the past several months, and has utilized his residence and premises to further the conspiracy to distribute controlled substances. Affiant also submits that MOORE, Brewer, Phillips, Hunter-Loftin, Theus, Watkins, Williams, and other members of the Gangster Disciples have remained in contact for the purpose of distributing illegal narcotics, more specifically heroin, and perpetrating gang violence. Affiant further believes that probable cause exists to have the residences/properties/outbuildings/vehicles of Dennis MOORE, aka "DA," located at **4030 Lynncrest Drive N.E., Cleveland, Tennessee**, searched for the following items:

(1) Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or manufacture of controlled substances;

(2) Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

(3) Books, letters, records, computerized and electronic records, receipts, bank

statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

(4) United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

(5) Controlled substances, material and paraphernalia for manufacturing, packaging, cutting, weighing and distributing controlled substances, in particular marijuana but not limited to scales, baggies, packing material;

(6) Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes and keys;

(7) The visual image, by way of photography, of all furnishings and equipment in, on, under, attached, or appurtenant to said premises;

(8) Papers, tickets, notes schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

(9) Firearms, ammunition;

(10) Any and all other material evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846, which includes possession with intent to distribute and distribution of controlled substances as well as conspiring to commit those offenses as well as violations of 18 U.S.C. § 922(g)(1), that is, possession of ammunition and/or firearms by a convicted felon.

_____
RODD WATTERS, AFFIANT

Sworn to and subscribed before me this

18th day of May, 2018

_____
Travis R. McDonough
United States District Judge

# ATTACHMENT A

**Description of the Residence/Premises/Property located at
4030 Lynncrest Drive N.E., Cleveland, Tennessee**

Described as a single family ranch style residence with red brick above a garage. The residence has a small concrete front porch to a glass storm door on the front of the residence. The residence also has gray shutters next to each window in the front of the residence. The driveway is located on the North side of the residence and drops from the street, down to a single car garage with an entrance door beside the garage door. There is a mailbox located at the end of the driveway with the numbers 4-0-3-0 located on the mailbox.

ATTACHMENT B

**Items to Be Searched for at the Residence/Premises/Property Located at
4030 Lynncrest Drive N.E., Cleveland, Tennessee**

(1)     Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or manufacture of controlled substances;

(2)     Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

(3)     Books, letters, records, computerized and electronic records, receipts, bank statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

(4)     United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

(5)     Controlled substances, material and paraphernalia for manufacturing, packaging, cutting, weighing and distributing controlled substances, in particular cocaine and marijuana, including, but not limited to scales, baggies, packing material;

(6) Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes and keys;

(7) The visual image, by way of photography, of all furnishings and equipment in, on, under, attached, or appurtenant to said premises;

(8) Papers, tickets, notes, schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

(9) Firearms;

(10) Cellular telephones, including the electronic address book, stored memory feature and the SIM card (or similar type of electronic data storage card) of the cellular telephone; and Pagers.

(11) Any and all other material evidence of violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, and 881, which include manufacturing, possession with intent to distribute and distribution of controlled substances; 18 U.S.C. § 922(g)(1), which includes being a felon in possession of firearms and ammunition; and 18 U.S.C. § 1956, which includes money laundering.